Your Honors, John Litchfield, representing Commissioner Strain. May it please the Court. There are two major issues, Your Honors. One, I guess, is a standing day in federal court because this is another standing case. And the other is the challenge that Tafurkey has made to the constitutionality of Louisiana's law involving labeling of food products. That's what this case is about. Since it's jurisdictional, I would ask the Court permission to start with the standing issue because I think that's crucial to this case. Tafurkey sells products essentially to vegetarians. They market their products saying, we don't have any meat in our products. We don't have any pork. We are vegetarian. Louisiana's law goes to something just the opposite of that. What Louisiana's law does is it says you cannot come into Louisiana and label your product as containing meat when it doesn't contain meat. If Your Honors ordered a hamburger, you would expect beef in your hamburger unless somebody says it's a pork hamburger or something. You don't expect sawdust being portrayed as meat, and that's what Louisiana's law does. Tafurkey challenges that law. Tafurkey says it's unconstitutional. We say you don't have a right to come into court to complain about Louisiana's law because you don't have any injury. There's no case of controversy here. They say their law, their labels do not violate Louisiana's law. Commissioner Strain says their labels do not violate Louisiana law. What about when Commissioner Strain's gone and it's somebody else? Well, Your Honor, I can't suppose all that. I can only say this. There's no evidence whatsoever in this record that there's any violation by those labels. Now, what they've said close to what you say is, well, maybe we have other labels. Those are just illustrative, those seven. Well, but you kind of said it, though, a little bit earlier in your argument, and I don't want to put words in your mouth, but I was going to ask about this subsection 9, which is utilizing any term that might suggest that it's misleading. And you said when somebody gets a burger, they expect it to be beef or they expect it to have meat in it. Well, that's what maybe I ascertained their worry is, their credible fear, whatever you want to call it. We'll see if it adds up to standing. But they sell plant burgers, or they sell beer brats, or they sell the other products, I guess, that are exemplars. Is there a risk under this statute that some commissioner comes in and says, no, you can't do that, because a burger, everybody knows a burger or a hot dog has meat in it? Well, we think that, but with our kind of burgers. I said a hamburger. Now, a hamburger, I propose, most people think, has some sort of meat in it. Doesn't have ham in it. Well, it may not have ham in it. In other words, how is that not enough to give them standing? It's not enough because they have not alleged in any form or fashion that they intentionally misbrand or mislead the public in their labels. And that's what they'd have to do. The Louisiana law doesn't say somebody makes a mistake. Louisiana law doesn't say somebody mischaracterizes something unintentionally. Louisiana law says intentionally misrepresents, excuse me, actually says intentionally misbrands or misrepresents. What about those other labels you referred to? Well, there aren't any labels. This is the problem I have with this case, Your Honor. One of the problems, and we had this at the district court, and Valley Forge, Supreme Court in Valley Forge, talked about this. Sometimes I feel like I'm in a debating society because I don't know what we're talking about. They say their labels don't violate the law. We say their labels don't violate the law. They say, well, maybe we have other labels. Then where are they? What are they going to say? I feel as though I'm dealing with nothing but hypotheticals in this case. You don't know what other labels there are. There aren't any. Your Honor, I would propose in the last counsel, but I propose none has been suggested to this court. The only thing that they suggested to the district court and the district court, to his credit, accepted was that those seven labels were just, quote, illustrative. The complaint doesn't say that. At least I don't recall the complaint saying that. Those are the labels that were presented to the district court to say this is our speech, and they, Louisiana, is violating my constitutional commercial right to speech by stopping me from saying that. We say no we're not. To me it's like this. Somebody's got a problem with a red light law. They're driving down the street, and they go through in a green light. A police officer stops them for something totally unrelated, and the fellow says, I didn't run through that red light. And the policeman says, you're right, you did not run through that red light. And then the fellow filed suit to challenge Louisiana's red light law. He doesn't have standing. You have to have a case or controversy. This is the very essence of Article III's grant. It's not just a prohibition. It's a grant of your authority. It's a grant of your jurisdiction. You're not supposed to be here, in all due respect, as an advisory committee. You're not supposed to be here as judges of a law school debate. I've got very good opposing counsel, very smart. They're very good, and I enjoy being with them, and I enjoy this dissertation and this discourse. But that's not what our Constitution says that this, these chambers, this body is here for. You're here to decide a case where people beyond this case, beyond the parameters of these four walls, know what we're talking about, know what Louisiana can do, know what Louisiana cannot do with labeling. But the lower court thought there were other labels. Well, I don't think so. He said, I think what the court said, I did bring to judgment, what the court says that they were—he just concluded they were merely illustrative. I don't really know how you come in the court and say these are my—this is my speech. These are my labels that I accuse you of violating my constitutional right of free speech, but they're just illustrative. Then what else are we talking about? What other—give me some other language. Give me some other speech that we are supposed to be curtailing, unlawfully curtailing. What is it? I don't know what it is, and that's why—and again, I've got very good opposing counsel, but I've not heard what speech are you saying we are violating? There was no discovery before this? We did—it was really—there are very few factual disputes here, Your Honor. They were competing motions for summary judgment because the law is what the law is. The labels are what the labels are, and they did submit some affidavits in addition to the basics, saying that they were in fear of prosecution, which— and again, Your Honor just came up with a case a couple of months ago, two or three months ago, dealt just with this Elephant case, where you have to have— that fear of prosecution has got to be something realistic. It can't just be some—as I think one of your colleagues said, some fanciful notion. This is the Supreme Court—this is your case, Your Honor. It's the Elephant case. It's the Texas State LULAC v. Elephant, E-L-F-A-N-T, and this Court decided it on October 26, 2022. I think it's good. That's illustrative. That shows you what standing is. And they did the same thing there. They said, oh, no, it's not—this is just something—we might do some more than that. And this is a Texas case involving voter registration. And this Court—a panel of this Court said, no, you don't have standing. And again, it's the same thing. They allege chilled speech. My speech is chilled, which is what they're alleging here. I can't come up with any more labels because my speech has been chilled. We haven't chilled anybody's speech. From Tofurky. Now, what I did—and I guess they criticized me for this, but I put in a footnote there that the commissioners examined these labels, the ones that presented to the district court, and found those not to be in violation. I put in there that, of course, I can't just guess what another label would be. Tofurky is a very respectful, upstanding company. It is not going to come in this Court and say, you know what, I intend to issue a label that's going to be intentionally deceptive, intentionally misbranding, intentionally misrepresenting a food product. Well, but you say that. I mean, the reality is, I guess you could—I mean, again, I'm going back to the subsection 9. They can't utilize a term that is the same as or deceptively similar to a term that has been used or defined historically in reference to a specific agricultural product, meat. Well, if they design a label that says beer brats or hot dogs, don't they have an arguable fear that, well, this statute could be enforced against us? I don't think it's a realistic argument. I don't think it's a realistic— How realistic does it have to be before they're standing? Maybe not win, but standing. Well, it depends on what stage. I think in the early stages, if this were a TRO, if this were maybe even a preliminary injunction stage, I might tend to agree with you. The Eighth Circuit said that in another Tafurkey case. At the early stage, in the preliminary injunction stage, it said, the plaintiff has the burden of showing in each stage of the proceedings that it is entitled to invoke this Court's jurisdiction. In the early stages, TRO, I get a phone call sitting in the office, John, somebody's here, TRO against your client. Standing is very easy to achieve. Preliminary injunction 10 days later, whatever, it's a little bit tougher. We are long before that. We're in dispositive motions. This Court has ruled that this Louisiana statute is unconstitutional. We're far beyond that. We're here. We're in the late stages of litigation involving this issue. And I don't think they're borne their burden of proof to show that they have any kind of real standing to be before this Court, especially at this late stage. And again, guidance, Judge Wilson is in this Alfond case. They go through, the Court goes through some various discussions about that and shows that at certain stages. Now, in the Eighth Circuit case, which I cited to the Court, which is another very similar case, it's a Missouri statute. And there, what the Missouri Appellate Court did, what the Eighth Circuit did, was say, look, at the preliminary injunction stage, it's close. I'm paraphrasing. It's close, but we're going to say they have standing at this preliminary stage because the district court can always go back and review standing at any stage, which I suggest you can also. Then the Eighth Circuit went on to say, oh, and by the way, you lose. You have standing, but you lose. These labels are not violative of Missouri law in that case. So, yes, they gave them standing at that early stage and then threw them out of court. They invited them into court and then threw them out of court. That's the Eighth Circuit. In this particular case, Your Honor, Judge Jackson looked heavily at another decision of this case called Barillo, which you came up with, I don't know, six months ago or a year ago. Barillo v. City of Houston. And Barillo was an interesting case, and Judge Jackson found it interesting. Mr. Barillo was what's called a busker. He was somebody who performed on the streets, just like we have in New Orleans. Well, Houston says you can't busk. You can't do that in certain areas. Mr. Barillo says, no, I intend to. I'm going to. This is how I make my living. And so Texas, what Texas says is we're not saying we're not going to arrest you. We haven't said we're going to, but we're not saying we're not. Because if you go busk in this area that's prohibited, you're taking your chances. This court said, yes, Mr. Barillo, you do have standing because you have a realistic fear that if you go busk in violation of Houston's statutes in this particular location, you're going to be arrested. Tofurkey's got no fear. It can't have any realistic fear because Commissioner Strain has already said it's not violative. And further to your question, Judge Wilson, which is an interesting question, I think any successor to Judge Strain, insofar as these labels are concerned, would be bound by that determination. I think they'd be bound by that determination. I don't think you can just change. The state just can't change an official and then say, oh, no, we told you something before. I would feel very embarrassed to come before you and say, well, this guy says, Commissioner Strain said no violation, but this guy says maybe there is. It's impossible. I think as a legal matter, he's bound by that. So I think that's it. I wouldn't say it's impossible. Well, nothing's impossible. I'm thinking of times back in state government days where the Attorney General changed opinions all the time. All of them were superseded under new circumstances. And I agree with you. In other words, there's nothing binding about what this Commissioner says, right? In this case, I think your question to me is, Mr. Littrell, isn't this a judicial admission? Didn't the state of Louisiana judicially admit those labels were not violative? Yes, sir. Yes, sir, they did. Get out of court. Okay. Which I've been invited to get out of court. But anyway, bottom line, Your Honor, that's – I just don't – I think this is a clear case, clear case of a situation where Tuferke has an interest in this. I'm not exactly sure why because it seems to me just the opposite. Tuferke is screaming to the whole world, buy our products. It does not contain meat. Louisiana says, great. We don't care about that. What we care about is somebody saying, buy our products. It contains meat. And it's a lie. Totally opposite. But for some reason Tuferke has gone around the country, at least in Missouri and in Arkansas, challenging similar laws. Your time has expired, and you've saved time for a bottle. Thank you. Ms. Howell? Thank you, Your Honors. May it please the Court, Amanda Howell for Plaintiff Appellee Tuferke. Where's the credible threat of enforcement? Of course. I think that what the state is intending to do in all of the argument that it's making, these assurances that the state has made don't exist actually in the text of the law itself. The text of the law itself, under the law, the act applies to Tuferke and other plant-based meat producers. It's a separate question whether Tuferke has misled. What the act does, and under the law Tuferke, who produces plant-based meat products, qualifies as a food producer. And what the law deems as food producers are basically not agricultural products, which covers things like beef and pork and crawfish, things like that. The law further defines meat to explicitly exclude plant-based meat products, which they define as synthetic products derived from plants, and cell-cultivated meat, which is any cultured animal tissue produced from in vitro cells. And then it goes on to say beef and poultry and things like that have to come from harvested production, harvested animals. So by the plain language of the law itself, the act applies to Tuferke. The act prohibits misrepresentations and then goes ahead. It applies to anyone who produces and sells food, right? It applies to anyone who produces food products. And I think, again, looking at the text of the law, the fact that the legislature felt the need to define meat to exclude exactly what plaintiff produces, and there's this kind of circular logic, circular definition. The state can't create a definition, and the text of the law says the following things constitute misrepresentations. Just rote invocation of this is a misrepresentation doesn't make it necessarily so. We're working off of this Orwellian state-issued dictionary where the state has defined what Tuferke does in representing things. What's Orwellian about having a state statute that says you can't misrepresent what it is that you're selling? I think it goes beyond saying you can't misrepresent something that you're selling. There are layers and layers of federal and state laws that already say exactly what Your Honor just said. You can't misrepresent what you're selling. The state goes one step further and says you can't misrepresent something as meat. That's incredibly broad and vague and arguably prescribed. What's Orwellian about that, though? You may say it's vague. Maybe it could be worded differently if you were in the legislature, but I don't understand how that's so overbearing that it's Orwellian. That's your word, so I'm asking you to justify it. Representing something as meat, it doesn't have any cabining provisions in that. Arguably, and there's no safe harbor for products that use terms like veggie burger. So even if you use the term veggie burger, under this law you're representing something as meat because the state has decided that representing something as meat is inherently misleading.  Council opposite said burger doesn't do that. In your example, it says plant-based burger. First, we're stuck with the text of the law itself. The law itself says the following conduct is inherently misleading, representing a food product as meat. And all of the assurances to apply this in a constitutional way and assurances that Wait a minute, that's not all it says. If you're reading from subsection 4, it's representing a food product as meat or a meat product when the food product is not derived from harvested beef, pork, poultry, alligator, farm-raised deer, turtle, domestic rabbit, crawfish, or shrimp carcass. That's a definition that's very concrete, is it not? But it's not concrete, Your Honor, what conduct actually runs afoul of the law. Because there's no cabining provision, because someone could say, Well, I use the term meat on my label, but I use the words vegetarian or plant-based ahead of that. The text of this does not have any safe harbor for those But FERC is not even in that world. The labels that are in the record don't say anything like plant-based meat. They say beer brats or hot dogs, but it is very clearly plant-based. In other words, is counsel opposite right that we're just imagining a controversy here? I disagree strongly. We've already, first of all, there's evidence in the record, and under Berilla, plaintiffs simply must set forth an affidavit or other evidence of the specific facts, which will be taken as true for purposes of summary judgment. And here we did exactly that. We have an affidavit from the CEO of Tofurky saying, I'm not convinced that our current labeling, our past labeling, and our continued labeling and marketing doesn't run afoul of this law. Because some commissioner could come in and say, This, to me, rings as representing something as meat, because you simply use the term beef on a product, even when it is accompanied by qualifying terms like vegetarian or plant-based. What subsection of the statute are you traveling under? I mean, where does the fear arise specifically? I think that the entire statute, beginning from, excuse me, that reads the act makes it illegal for any person to intentionally misbrand. And, again, that's because the statute is doing that circular argument by saying the following conduct constitutes intentionally misbranding, but we're going to seek to enforce as intentional misbranding. And, again, the commissioner saying disavowing from nine labels that were in the complaint doesn't really give any balm to that chill of free speech, because there are a lot more. I'm not entirely certain why the commissioner didn't address the entirety of the labels that were submitted with the motion for plaintiff's motion for summary judgment, and we don't have the benefit of a reply brief here, but Tofurky is a company that every day sells products to consumers, every day they're making marketing representations. They have no assurances as to those marketing representations if they're running afoul of the law. They have no assurances that any time they come up with a new product that they're not doing something the commissioner might see as representing it as meat, again, because there's no safe harbor for the use of qualifying terms. So what do your labels say about whether the product contains meat or the other things that are defined in the statute? I think that, again, there are two separate questions, whether Tofurky engages in things that objectively. I'm asking you a question about what your labels say. Yes, Your Honor. The labels do always use qualifying terms like plant-based and then plus a meat type of term like burger or deli slices or ham roast, things like that. But I think we have to look at, and the burden, again, is on the state to show that this doesn't cover, and I think it's very clear that this does cover, and it's so vaguely worded and sweeping in scope, is to cover protected commercial speech. And that places the burden then squarely with the state to show that this law, as written in the text of it, and I think the plain language of the text is very clear, and we don't have to go beyond that to show that it covers truthful commercial speech, that then the burden is with the state to show this doesn't go, first of all, that the harm is real and that this law directly and materially advances the state's commercial, excuse me, the state's interest in preventing against consumer confusion. It's not just confusion. The Act requires an intent to mislead. And if you're saying and your labels have no intent to mislead, then how can you be worried about this in the future? I think that that SIENTA requirement, intent to mislead, is a little bit of a red herring because it says the following conduct is what the commissioner is going to determine is intentionally misleading. So simply by representing, simply by doing the act of representing a product as meat or what could be arguably prescribed or arguably covered under the law as representing a product as meat, including things like plant-based deli slices, again, with the qualifying term, but that's not, that cabining is not in the text of the law. There is no safe harbor for that. So I would say that by saying plant-based deli slices or plant-based sausage, that is representing a product as meat, and the state has decided on its own, which actually contravenes common sense and I think consumer understanding, that inherently then just by representing something as meat, then constitutes intentional misbranding. So if we look at this, intentionally misbrand or misrepresent a food product by doing any of the following things. So again, that circular argument, and I think there are plenty of similar cases, including Speech First v. Fenves, where the court ruled that nomenclature doesn't alter reality and American Academy of Implant Dentistry v. Parker says, you know, just because the speech doesn't comport with, in that case, the ADA's list of designated specialties, in this case the government's desired meaning for meat, that doesn't mean, that doesn't alter reality, that doesn't mean that it's inherently misleading. I think another case on point is O.C.C. Creamery v. Putnam, which reads, it's undoubtedly true that a state can propose a definition for a term. It doesn't follow that once the state has done so, any use of the term inconsistent with the state's preferred definition is inherently misleading. And that court noted that ascribing to that rule would eviscerate Central Hudson, wouldn't require the state to have to show its heavy burden under Central Hudson to show, again, there is a real harm here, that this law, this very broad and sweeping law, actually serves to prevent against consumer confusion. Again, and in the record here, the state actually relies so heavily on that first prong of Central Hudson and relies so heavily on the standing issue here, saying, oh, this law doesn't actually do what you say. And again, there are cases saying that affidavits from AGs or commissioners disavowing from the law, unless it's a complete disavowal, that doesn't actually constitute compelling contrary evidence sufficient to cure the reasonable fear of prosecution. But there is evidence in the record. The state completely failed to put any evidence in the record to meet its burden under Central Hudson's third and fourth prong, that directly and materially advance and no more extensive than necessary. It has no evidence of consumer confusion. It admitted that much in the record. And what's more, even though the burden, that heavy burden is with the state, plaintiffs submitted actually evidence in the record showing that consumers are not confused by this type of naming and labeling conventions and that, in fact, if this law were to be enforced by forcing food producers to remove meat terminology like burger, including when it had veggie burger in front of it, it would actually cause consumer confusion when there was none. So here I think that this case rises and falls just completely on Central Hudson's third and fourth prongs. But the statute deals only with intentional misbranding, so I really don't see how Central Hudson even applies. And again, I think respectfully, Your Honor, that's falling for the trick of the statute. It says we consider all of these things, which are very broad things, representing something as meat, representing something as beef. We don't know what that means to be representing something as beef. We consider all of these things to be an act of intentional misbranding. So again, we have this preferred term to exclude plant-based producers, and that's what the state has decided is intentionally misbranding. Unfortunately for the state, that doesn't comport with reality. That doesn't comport with current consumer understanding of products. And it can't just unilaterally, and that's why I said Orwellian earlier, it can't just unilaterally determine that this conduct that is in this laundry list of conduct that's prescribed by the law is somehow intentionally misbranding. What if we read the statute differently than you? I mean, I think it's crystalline clear. There's an intent to misbrand or misrepresent any food through any activity including. In other words, if you sell food under the name of an agricultural product, it has to be an agricultural product. If you can't intentionally misbrand or intentionally misrepresent food as an agricultural product when it's not, that seems pretty clear to me. And you go on down through the statute. Again, I go back. I guess so if my reading of the statute is correct, that there is this intent there that overlays the conduct. In other words, the conduct itself is not per se intent, which is I think what you're saying. If I disagree with that, what else in the statute do you object to? I think that, again, respectfully, Your Honor, the raw invocation of things like intentional misbranding doesn't mean that the state has met its burden to show that there's actually a real harm here sufficient to justify this law, which is a broad-sweeping ban on speech. The legislature can pass a law that requires truth in advertising, can it not? It can and has. Isn't that what this is? I think it goes far beyond that. It's policing what types of products can use meat representations, meat terminology, even meat pictures. But what is that? Excuse me? Your argument seems to be based on you've said that the statute is very clear in what this does, but then you're using terms like meat-based terms, like burger, sausage, whatever. I guess what I'm trying to drive you to is this subsection 9, this historically defined terms. Maybe, but that's not a clarity. That's an ambiguity in the statute. I would agree with you, Your Honor, that that's incredibly ambiguous. I would also go further and say that the additional provisions that the state has defined to be intentionally misbranding, intentionally misleading, representing a product as beef, I'm not sure. It either is beef or it's not. You're not giving me an inch. I'm trying my best. Representing, Your Honor, I apologize. I think that this is due to the confusion of the way that the law is written. And it's as written, and we're stuck with the plain language of the law itself, if a product represents itself or represents itself as beef, what conduct would Tofurky know to avoid? Would it be able to say beef? We'll sell stuff that's not beef and call it beef. Well, would you have to? What if you said plant-based beef? Would that be okay under the statute? Because I think that arguably, and it's very clear that that is not okay. And some commissioner could come along. And, again, we only have disavowal. Is that what you all are doing? I'm sorry? I don't see anything in the record that says plant-based beef. Plant-based burgers? Yes, Your Honor. Again, Tofurky sells products on a daily basis, comes out with new products, comes out with new marketing representations. There are products. And the nine labels in the record are not all of the world of Tofurky's speech. They have things like plant-based ham, plant-based turkey, plant-based sausage. And I think under this law, they would not be able to, that would be considered representing it as beef again because, or as meat, because there are no safe harbors available. There's nothing saying unless you have the words, a disclaimer, unless you clarify that this is plant-based, you can't, you know, then that's fine under the law. That goes right back to the preface of the statute, which requires an intent to misbrand or misrepresent. And if that's not done, I don't see how it's enforceable or violated with the statute. Respectfully, Your Honor, I think that the intent is, there is no intent requirement. The intent is simply to represent, if you're using any of these terms, if you are intentionally putting products out in the market that in some way use meat terminology, show meat images, even when you have plant-based, they've decided if you're doing that, we have decided that you're intentionally misbranding. We've decided that through any activity, including the following means, if you run afoul of any of these provisions, we are assuming that intent requirement upon you. And, again, I think that we have established chilled speech here. We, again, taken as true for the purposes of summary judgment, we have established that tofurkey has refrained from certain speech. It's removed certain things from its website and from its advertising. And out of fear of enforcement, it intends to continue engaging in selling plant-based meat products, of course. But under this law, it would arguably not be able to sell its products at all, let alone call them things like plant-based burgers. And I think that the disavowal that is allegedly one way that tofurkey would not be able to have a chill here, there are plenty of cases saying that that's not sufficient compelling contrary evidence in order to cure chill, that speech first be fund-based, declarations by officials claiming a lack of intent don't constitute compelling contrary evidence. I would also direct Your Honor's attention to the fact that the state, even though there are many labels constantly put into commerce, even though we gave a lot more labels in our motion for summary judgment, the disavowal is limited to nine labels. And in the opening of the state's brief, page 901, the commissioner is careful to say we make no representations about other conduct that tofurkey might engage in. That sounds to me, Your Honor, like a threat that we are reserving the right to apply this law to tofurkey in the future. So even though they might have attempted to assuage fear through that footnote, I think that actually does the opposite and says the commissioner has looked at nine labels out of hundreds and potentially thousands of marketing representations that tofurkey has made, and we're okay with these nine labels. And I think that if we were to allow the state to moot out a case or give not even case-specific amnesty, because these are only nine labels we're talking about, I think that that would mean that we're allowing them to avoid meeting their burden in their central Hudson and showing that this law, which is incredibly broad and does prescribe truthful commercial speech, that we don't have to arrive at that at all. And I think that that is inappropriate here. And unless the Court has further questions. Thank you, Ms. Howell. Mr. Litchfield for Rebono. Thank you, Your Honor. It's very short, and I do appreciate the accommodation. I think counsel is conflating the standing issue with the issue as to whether or not the statute itself is unconstitutional. They're two different things. They have the burden of proof. Tuferke's got the burden of proof of standing. That is some harm, some concrete, demonstrable harm to an as-is challenge to Tuferke. That's it. On the facial challenge, even if they had standing, the facial challenge is they have to show that under no circumstances this is a law constitutional. I suggest to you that if somebody comes in and says, I got sawdust here, I'm going to represent it to be meat and sell it and make a fortune to the people of Louisiana, that's a proper reason for this statute. So I think on the facial it falls. On the as-applied, I think it would fall as to Tuferke, which is as-applied, because it's got no damages. It's got nothing. So I think those, unfortunately, I think counsel is conflating those two, Your Honor. And one simple final thought. I didn't get a chance to talk too much about the merits of the case because I got so hung up on standing. But on the merits, I think central Hudson, which is the Hallmark case, stands clearly that commercial speech is not like individual speech. The EEOC case you had before, that's individual speech probably. This is clearly nothing but commercial speech. Tuferke doesn't, or anybody with commercial speech, does not have the same latitude that they would if they were individual, such as political speech. And I think the Supreme Court in central Hudson was very clear in saying a state can ban misleading or deceptive commercial speech. And that's all we're trying to do. Thank you very much, Your Honors. Thank you, Mr. Fitzfield. Your case and the policy.